# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

3:22MJ312 (TOF)

STATE OF CONNECTICUT          :          **FILED UNDER SEAL**
                              :
**COUNTY OF HARTFORD**          :          March 16, 2022

## OMNIBUS AFFIDAVIT IN SUPPORT OF
## A CRIMINAL COMPLAINT AND FOUR SEARCH WARRANTS

I, Brian Womersley, being duly sworn, depose and state as follows:

### BACKGROUND OF AFFIANT

1.      I am a Special Agent (SA) with Homeland Security Investigations (HSI) since August 2020.  I received training at the Federal Law Enforcement Training Center, Criminal Investigator Training Program (CITP) and Homeland Security Investigations Special Agent Training (HSISAT).  Prior to becoming a Special Agent, I was a Police Officer with the Concord New Hampshire Police Department from April 2010 to August 2020.  I was a Detective for the Concord NH Police Department for the Criminal and Juvenile Divisions where I authored search/arrest warrants and investigated the crimes of homicide, child exploitation, drug related offenses to include trafficking/distribution, gang related, human trafficking, counterfeit/fraud investigations among others.  I am presently assigned to the HSI office in Hartford, Connecticut. I have received training in the area of child pornography (as defined in 18 U.S.C. § 2256) and child exploitation. I have participated in the execution of numerous search and arrest warrants involving child exploitation and/or child pornography offenses.

2.      I am currently investigating an individual, Justin MCKENNEY, an adult male (YOB 1994) for violating the following federal offenses:  (a) 18 U.S.C. § 2422(b) enticement of a minor to engage in illegal sexual activity; (b) 18 U.S.C. § 225A(a)(2) receipt and attempted receipt

of child pornography; (c) 18 U.S.C. § 225A(a)(5) possession of child pornography; and (d) 18

U.S.C. § 1470, transfer of obscene material to a minor (collectively, the "TARGET OFFENSES").

      3.      I subscribe this affidavit in support of an application for a search warrant for the

following:

    a.   63 Belaire Circle Windsor Locks, Connecticut (hereinafter "TARGET PREMISES"), which is further described in Attachment A-1, for contraband and evidence, fruits and instrumentalities of the TARGET OFFENSES, further described in Attachment B-1.

    b.   JUSTIN MCKENNEY's person, which is further described in Attachment A-2 for evidence, fruits and instrumentalities of the TARGET OFFENSES, further described in Attachment B-2.

    c.   A 2020 Toyota Camry SE, bearing Connecticut license plate number BB23771 and Vehicle Identification Number (VIN) 4T1G11AK4LU302269 (the "TARGET VEHICLE"), which is further described in Attachment A-3, for contraband and evidence, fruits and instrumentalities of the TARGET OFFENSES, further described in Attachment B-3.

    d.   A cellular phone with the assigned number 719-666-1534 (the "TARGET CELL PHONE"), which is further described in Attachment A-4, for contraband and evidence, fruits and instrumentalities of the TARGET OFFENSES, further described in Attachment B-4.

The foregoing locations are collectively referred to herein as the "SEARCH LOCATIONS"

      4.      In addition, I subscribe this affidavit in support of a criminal complaint and arrest

warrant for MCKENNEY for the TARGET OFFENSES

      5.      Based on the information set forth in this affidavit, I believe there is probable cause

that (a) the SEARCH LOCATIONS contain/bear items that constitute   contraband,

instrumentalities, fruits, and evidence of the TARGET OFFENSES; and (b) that MCKENNEY

committed the TARGET OFFENSES.

      6.      The statements contained in this affidavit are based in part on information provided

by other members of local, state, and federal law enforcement, including HSI personnel and

investigators from the Glastonbury, CT Police Department; my own investigation to include personal observations, documents and other investigative materials which I have reviewed; and my training and experience as a Special Agent with HSI.  Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES are located within the TARGET PREMISES and amongst MCKENNEY himself.

## TARGET OFFENSES

7.    As noted above, this investigation concerns alleged violations of the following:

a.  Title 18, United States Code, Sections 2252A(a)(2)(A) and (b)(1) prohibit a person from knowingly receiving or distributing, or attempting or conspiring to receive or distribute, any child pornography or any material that contains child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or using any means or facility of interstate or foreign commerce shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

b.  Title 18, United States Code, Sections 2252A(a)(5)(B) and (b)(2) prohibit a person from knowingly possessing or knowingly accessing with intent to view, or attempting or conspiring to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

c.  Title 18, United States Code, Section § 2422(b) prohibits a person from knowingly persuading, inducing, enticing, or coercing any individual who has not attained the age of 18 years, through the use of any means and facility or means of interstate commerce, to engage in any sexual activity for which any person can be charged with a criminal offense.[1]   The statute also prohibits a person from attempting and conspiring to do

---

[1] "In this chapter, the term 'sexual activity for which any person can be charged with a criminal offense' includes the production of child pornography, as defined in section 2256(8)."  18 U.S.C. § 2427. In addition, under Connecticut state law, a "person is guilty of sexual assault in the second degree when such person engages in sexual intercourse with another person and: (1) Such other person is thirteen years of age or older but under sixteen years of age and the actor is more than three years older than such other person…" Conn. Gen. Stat. § 53a-71.

the same.

      d.   Title 18, United States Code, Section 1470 prohibits a person who "using the mail or any facility or means of interstate or foreign commerce, knowingly transfers obscene matter to another individual who has not attained the age of 16 years, knowing that such other individual has not attained the age of 16 years, or attempts to do so…"

## DEFINITIONS

8.      The following definitions apply to this Affidavit:

      a.   "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

      b.   "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors, but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

      c.   "Child Pornography," as used herein, includes the definition in 18 U.S.C. § 2256(8) ("any visual depiction including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means of sexually explicit conduct, where (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually

explicit conduct."), and also includes any visual depiction, the production of which involves the use of a minor engaged in sexually explicit conduct. 18 U.S.C. §§ 2252 and 2256(2).

d. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, and mobile phones and devices. *See* 18 U.S.C. § 1030(e)(1).

e. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

f. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alphanumeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions

when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

g.   "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. Traditionally, IP addresses were either dynamic, meaning an Internet service provider (ISP) assigns a different unique number to a computer every time it accesses the Internet, or static, meaning an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. Generally, the static IP addresses were assigned by those companies who offered "broadband" Internet service, such as through cable or digital subscriber line (DSL), whereas "dial-up" companies would assign their users dynamic addresses. Now, however, as a greater number of American Internet users choose broadband Internet service, many of these users are being assigned what may be colloquially referred to as a "sticky dynamic IP address" or a "sticky IP."  A sticky IP is a dynamically assigned IP address that does not change often. The address leases are usually set to long periods and simply renewed upon expiration. The practical effect is that one may observe a user being assigned the same IP address for weeks or months and then assigned another IP address for a similar stretch of time.

h.   "Internet Service Providers" ("ISPs"), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.

i.   The "Internet" is a global network of computers and other electronic devices

that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

j. "Minor" means any person under the age of 18 years. 18 U.S.C. § 2256(1).

k. "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a game.

l. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

m. "Remote Computing Service" ("RCS"), as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

n. "Sexually explicit conduct" means actual or simulated (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person. 18 U.S.C. § 2256(2)(A).

o. A "storage medium" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

p. An "electronic medium" is any computer, computer hardware, or storage medium, as defined previously.

q.   "Visual depiction" includes undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format. 18 U.S.C. § 2256(5).

## SUMMARY OF INVESTIGATION

9.     MCKENNEY is under investigation for the sexual assault of a 13 year old female (Minor Victim 1 or MV1) in Glastonbury, Connecticut.  In the course of that investigation, law enforcement developed evidence that MCKENNEY is using Snapchat[2], a mobile application, to connect with minor females.  The investigation further indicated that MCKENNEY uses an account on Snapchat to portray himself as a minor male, usually 16 years of age and, using this alias, (a) sent images and videos of himself and his naked genitalia to females under the age of 16; and (b) received images and videos from minor females, including images/videos that are child pornography; and (c) persuaded and enticed a minor female to engage in illegal sexual activity.

## Minor Victim 1

10.    On October 11, 2021, the parents of MV1 contacted the Glastonbury Police Department ("GPD") to report that MV1 was sexually assaulted by an unknown male.  MV1 reported to the GPD that she was sexually assaulted by someone she communicated with on

---

2 Snapchat is a mobile social media communication application owned by Snap Inc. and it is available through the iPhone App Store and Google Play . Snapchat provides a way to share photos, videos, and text with other Snapchat users. One of Snapchat's differentiating features is that a sender is able to set a variable amount of time the message is viewable by the receiver.. At the expiration of time, the message is deleted from Snapchat's servers. Similarly, the message disappears from the user's devices. If the receiver of a Snapchat message does not access the application on their device the message remains undelivered. Snap's services are designed to store unopened snaps for 30 days. After 30 days the messages are deleted from Snap's servers.

Snapchat and who she knew by the names "Jason" or "J" and described as a white male, possibly late teens, with acne scars on his face. MV1 stated that she is a freshman at Glastonbury High School and "J" told her that he is a junior at the same school. MV1 stated that on several occasions "J" asked her to "sneak out" of her house, at night, to meet with him. MV1 reported that she agreed to meet "J" for the first time on the night of October 5, 2021. That night, MV1 snuck out of her house and walked to a nearby school parking lot to meet "J".

11.   MV1 stated that "J" drove her several minutes away to an unknown location at the side of the road. He then locked the car doors and forced himself on top of her. MV1 stated that she told "J" to stop and tried to open the car door but couldn't. MV1 stated that "J" used force to penetrate her vagina with his penis. MV1 stated that, after the incident, "J" was driving back and MV1 said "let me out of the car". "J" then stopped the car and said "you'll never know my real name, I used a fake name and fake "Snapchat" name." MV1 stated that she then got out of the car and called her mother, who picked MV1 up several blocks from their home.

12.   On November 2, 2021, MV1 was forensically interviewed at the Child Advocacy Center New Britain, CT which was video and audio recorded. Your affiant watched this video interview and noted the following pertinent information. MV1 said the conversations between MV1 and "J" began in September (2021) when he "added" her on "Snapchat"" and she "added" him back. MV1 explained that the term "added by search" appeared when "J" added her on "Snapchat".[3] MV1 stated that "J" asked MV1 if she went to Glastonbury high school and MV1 confirmed this. MV1 reported that "J" stated that he went to Glastonbury high school, too. MV1 said that "J" wanted to hang out numerous times, but she had refused. MV1 explained that "J" was convincing and eventually "persuaded" MV1 to hang out.

---

3 In my training and experience, "added by search" means that "J" looked up MV1's name or username and added her as a contact/friend on Snapchat.

13.     When asked what night the sexual assault occurred, MV1 appeared to check her phone for messages with her friends as a method of cross referencing the date, and then stated that it was "October 5, 2021".  MV1 stated that she snuck out of her house via her window and met "J" at an elementary school.  MINOR VICTIM 1 stated that "J" picked her up in his car, which she described as a gray four door vehicle with a "touch screen" system in it.  MV1 described "J" as a young male who looked "16", had one ear piercing in his right ear, had a big nose, blonde hair, average build and was approximately "5'10"" in height.  MV1 stated that she asked "J" when he got his drivers' license and "J" told her he got it recently.

14.     When describing the sexual assault, MINOR VICTIM 1 stated that "J" reclined her seat back, pushed her down, kissed her and ultimately penetrated her vagina with his penis.  MV1 stated that her phone was going off during this time.  She answered the phone and then told "J" that she needed to go home, and "J" then drove her home.  MINOR VICTIM 1 stated that, once there, "J" told MINOR VICTIM 1 that his name was fake.  MINOR VICTIM 1 stated that "J" then blocked MINOR VICTIM 1 on "Snapchat".

### Search of MV1's Phone

15.     On October 11, 2021, MV1 and her parents provided written consent for law enforcement to search the contents of MV1's cellphone.  Based upon a review of MV1's phone, it appeared that that MV1 first met with MCKENNEY on September 17, 2021.  In particular, MV1's phone contained the following information and communications:

•     On September 16, 2021, MV1's phone was used to conduct an internet search of "Glastonbury ct from Windsor Ct."

•     On September 17, 2021, MV1 sent the following messages to a friend, "L"[4]:

---

4 I am only including the first initial of the contact name in MV1's phone because it appears that "L" is a minor.

o       12:23AM: Lowkey think I'm going to get murdered (emoji and multiple
exclamations).

o       12:25AM: Bro deadass I think I'm getting murdered.

o       12:26AM: WAKE UP.  (During this time she attempted multiple Facetime
calls with L that were not answered).

- On September 17, 2021, at 2:45AM, MV1's phone was used to search "what
street is naubuc elementary."

- On September 17, 2021, MV1 exchanged the following messages with "L"

    o   11:03AM: Bro my mom had no idea.

    o   11:25AM: Omg I forgot the best part he told me to snap[5] him when I'm
        home just to know I got there safe.

    o   11:26AM L replied "Awwwww".

    o   11:27AM: HE WAS LITERALLY FALLING ASLEEP IN THE CAR SO I
        THINK HE LIKE QENT HOME AN FELL ASLEEP RIGHT AWAY.

    o   11:44AM: HES LEFT ME ON DELIVERED FOR LIKE 3 HOURS BUT
        IK HE WAS HIGH AND TIRED AND HE HAS SCHOOL.

    o   11:44AM: L replied: "Wait so he lives in Windsor and how old is he."

    o   11:44AM: "he looks eh on pics but like he's lowkey hot in person and 16."

    o   11:50AM: "I forgot to brush my teeth and like my mouth tastes like it. Like
        its still lingering."

    o   12:00PM: L replied: "Ew I have gum."

    o   12:43PM: Oh did I mention he wears rings.  And his hands r like 2x the size
        of mine

---

5 Based on my training and experience, I believe "Snap" refers to a chat, photo and/or video that can be
sent directly with another Snapchat user (or users).

**State Search Warrants for Snapchat Records**

16.    On or about October 19, 2021, the GPD obtained a search warrant for MV1's

Snapchat Account for evidence of Sexual Assault in the First Degree.  After reviewing the

information contained in MV1's Snapchat return, GPD determined that the individual who met

MV1 on October 5, 2021 utilized a Snapchat account with the user name "keepingupg".  In

addition, based on the information in that return, and as explained in more detail below, GPD

believed MV1 and the user of "keepingupg" met in person prior to October 5, 2021.

17.    After reviewing the "Snapchat" search warrant results, GPD spoke with MV1 and

her mother.  MV1 repeated that she was sexually assaulted by "J" on October 5, 2021.  MV1

denied that she met "J" on any other date.  MV1 confirmed that  "J" 's Snapchat account bears

the username "keepingupg".

18.    On or about November 12, 2021, GPD obtained a search warrant for the

"keepingupg" account (hereinafter, MCKENNEY's Snapchat Account) for evidence of Sexual

Assault in the First Degree.  The display  name for this Snapchat account was "Georgeee" and it

did not have a link to any email, phone number or other identifiers.  The keepingupg account was

created on September 2, 2021.

19.    The  following  are  excerpts  of  pertinent  conversation  between  MV1's  Snapchat

Account and MCKENNEY's Snapchat Account:

| Date and Time (EDT) | SENDER | Message[6] |
|---|---|---|
| 9/21/21 6:28 AM | MV1 | damn wyd tonightttt |

---

6 Except as noted in footnote 7 and 8 below, the messages in this Affidavit are not edited, including
misspellings, slang and/or acronyms .

| | | |
|---|---|---|
| 9/21/21 7:25 PM | MCKENNEY | I'm chilling hbu[7] |
| 9/21/21 7:28 PM | MV1 | finishing hw |
| 9/21/21 7:31 PM | MCKENNEY | Ahh gotcha when we about to chill again shawtyy |
| 9/21/21 7:31 PM | MV1 | mm i can tonightttt |
| 9/21/21 7:32 PM | MCKENNEY | Hmm What time |
| 9/21/21 7:32 PM | MV1 | probably 12 |
| 9/21/21 7:36 PM | MCKENNEY | Hmm we about to pick up where we left offf ðŸ¤£[8] |
| 9/21/21 7:40 PM | MV1 | mm probably anyways brb i'm taking a shower lol |
| 9/21/21 8:10 PM | MV1 | also the elementary school again?? |
| 9/23/21 8:20 PM | MCKENNEY | Whatcha doing |
| 9/23/21 8:20 PM | MV1 | just took a showerrr wbuuu |
| 9/23/21 8:21 PM | MCKENNEY | I'm getting in now wyd tonight |
| 9/23/21 8:21 PM | MV1 | nothing i just have to finish hw |
| 9/23/21 8:22 PM | MCKENNEY | Bedtime early |
| 9/23/21 8:23 PM | MV1 | ?? |
| 9/23/21 8:28 PM | MCKENNEY | U going to bd early |
| 9/23/21 8:28 PM | MV1 | probably not |
| 9/23/21 8:30 PM | MCKENNEY | Like same time |
| 9/23/21 8:30 PM | MV1 | wdym |

7 It appears that the extraction software used to obtain this Snapchat conversation did not accurately read apostrophes.  Instead, it appeared to replace apostrophes with the following: "â€™".  For example, the extraction showed this sentence as "I â€™m chilling hbu¨  For ease, I've edited the conversations in his affidavit by deleting each â€™ and inserting an '.

8 Based on my training and experience, I believe the extraction report uses this combination of characters (or a similar one) to reflect the sending/receiving of an emoji or emojis.  It is unclear what emoji(s) was/were sent.

| 9/23/21 8:31 PM | MCKENNEY | Like 1230 |
|---|---|---|
| 9/23/21 8:31 PM | MV1 | probably 12 |
| 9/23/21 8:33 PM | MCKENNEY | Gotcha ima try and stay up lily bout to suck the whole thing |
| 9/23/21 8:33 PM | MCKENNEY | Lol |
| 9/23/21 8:33 PM | MCKENNEY | * |
| 9/23/21 8:34 PM | MV1 | maybeeee |
| 9/23/21 8:34 PM | MCKENNEY | Lol u still on ur period ðŸ¤” |
| 9/23/21 8:34 PM | MV1 | nope |
| 9/23/21 8:34 PM | MCKENNEY | Ha |
| 9/23/21 8:34 PM | MV1 | whatttt |
| 9/23/21 8:35 PM | MCKENNEY | That means I could play with it |
| 9/23/21 8:35 PM | MV1 | maybeeeee |
| 9/23/21 8:35 PM | MCKENNEY | lol |
| 9/23/21 8:35 PM | MCKENNEY | A lot of maybes |
| 9/23/21 8:36 PM | MV1 | mhm but it doesn't mean nooo |
| 9/23/21 8:36 PM | MCKENNEY | Maybe if the tip will fit it can go in |
| 9/23/21 8:36 PM | MV1 | idkkkk |
| 9/23/21 8:36 PM | MV1 | wyddd |
| 9/23/21 8:37 PM | MCKENNEY | I'm in the shower lol |
| 9/23/21 8:41 PM | MV1 | funnn so 12 at the school again?? |
| 9/23/21 9:10 PM | MCKENNEY | Yea I'm trying to stay up babe |
| 9/23/21 11:29 PM | MCKENNEY | Wyd |
| 9/23/21 11:29 PM | MV1 | nothingggg |

| 9/23/21 11:30 PM | MCKENNEY | Same what time u comin out |
|---|---|---|
| 9/23/21 11:31 PM | MV1 | uhhh idk hold on |
| 9/23/21 11:31 PM | MCKENNEY | Gotcha |
| 9/23/21 11:33 PM | MV1 | probably like 10 mins |
| 9/23/21 11:33 PM | MCKENNEY | Haha ok |
| 9/23/21 11:37 PM | MV1 | r u there?? |
| 9/23/21 11:37 PM | MCKENNEY | U want me to go there |
| 9/23/21 11:39 PM | MV1 | uhhh i'm leaving like now so ig?? |
| 9/23/21 11:39 PM | MCKENNEY | Kk |
| 9/23/21 11:39 PM | MV1 | kk |
| 9/23/21 11:47 PM | MV1 | here |
| 9/23/21 11:48 PM | MCKENNEY | What's the name |
| 9/23/21 11:48 PM | MV1 | naubuc[9] |
| 9/23/21 11:49 PM | MCKENNEY | Kk 2 min |
| 9/23/21 11:49 PM | MV1 | kk |
| 9/23/21 11:55 PM | MCKENNEY | I'm right here |
| 9/23/21 11:55 PM | MV1 | kk |
| 9/23/21 11:55 PM | MV1 | in the car?? |

20.    The next day, September 24, 2021, MV1 and MCKENNEY  exchanged the following messages on Snapchat:

---

9  I am aware that "Naubuc" is the name of an elementary school located in Glastonbury, Connecticut.

| Date and Time (EDT) | SENDER | Message |
|---|---|---|
| 9/24/21 7:58 AM | MV1 | hiii |
| 9/24/21 9:12 AM | MCKENNEY | My bad I fell asleep Right when I got home |
| 9/24/21 9:13 AM | MV1 | wowww |
| 9/24/21 9:13 AM | MV1 | I'm sore and it like hurts so bad |

21.    After MV1 sent the message at 9:13AM that she was sore, MCKENNEY does not message her on Snapchat again until September 27, 2021 (approximately 3 days later). MCKENNEY appears to explain the silence by claiming his mother took away his phone because he was sleeping in his classes:

| Date and Time (EDT) | SENDER | Message |
|---|---|---|
| 9/27/21 9:00 PM | MCKENNEY | I got my phone taken away |
| 9/27/21 9:01 PM | MCKENNEY | I was sleeping in like three classes |
| 9/27/21 9:01 PM | MCKENNEY | My baddd |
| 9/27/21 9:02 PM | MV1 | ohhh that sucks i'm sorry |
| 9/27/21 9:04 PM | MCKENNEY | It's straight |
| 9/27/21 9:04 PM | MCKENNEY | Whatcha been up too |
| 9/27/21 9:05 PM | MV1 | nothinggggg |
| 9/27/21 9:06 PM | MCKENNEY | Ughhh I had so much fun the other night |
| 9/27/21 9:12 PM | MV1 | awee |
| 9/28/21 7:15 AM | MV1 | wyd tonight?? |

| 9/28/21 10:47 PM | MCKENNEY | I'm chilling I just snuck my phone wyd |
|---|---|---|
| 9/28/21 10:47 PM | MV1 | finishing hw whyd you get your phone taken?? |
| 9/28/21 10:48 PM | MCKENNEY | I was sleeping in all my classes |
| 9/28/21 10:48 PM | MCKENNEY | My ma was bugging |
| 9/28/21 10:49 PM | MV1 | whyyy |
| 9/28/21 10:49 PM | MV1 | I'm skipping tomorrow |
| 9/28/21 10:49 PM | MV1 | i have a test and i don't feel like studying for it rn |
| 9/28/21 10:50 PM | MCKENNEY | Lol She definitely thinks it's the phone keeping me up |

22. The following are excerpts of Snapchat messages between MV1 and MCKENNEY's Snapchat Account indicating that they met around midnight on 9/28:

| Date and Time (EDT) | SENDER | Message |
|---|---|---|
| 9/28/21 10:52 PM | MCKENNEY | What time could you chill lol |
| 9/28/21 10:52 PM | MV1 | uhhh probably like 11:30 |
| 9/28/21 10:57 PM | MCKENNEY | Yea I think I could get out lol |
| 9/28/21 10:58 PM | MV1 | okayyyy |
| 9/28/21 11:42 PM | MCKENNEY | I'm bout to be in Glas |
| 9/28/21 11:43 PM | MV1 | i'm still not readyyyyy |
| 9/28/21 11:44 PM | MCKENNEY | It's straight lol |
| 9/28/21 11:44 PM | MCKENNEY | I gotta get gas |
| 9/28/21 11:45 PM | MV1 | kk |
| 9/28/21 11:45 PM | MCKENNEY | How long u need u think |

| 9/28/21 11:50 PM | MV1 | leaving now |
|---|---|---|
| 9/28/21 11:56 PM | MCKENNEY | Kk |
| 9/28/21 11:56 PM | MCKENNEY | Wait what we about to do lol |
| 9/28/21 11:57 PM | MV1 | idkkk |
| 9/28/21 11:57 PM | MCKENNEY | HAHA |
| 9/28/21 11:57 PM | MV1 | lol |
| 9/29/21 12:00 AM | MV1 | here |
| 9/29/21 12:01 AM | MCKENNEY | I'm Here |
| 9/29/21 12:01 AM | MV1 | which side |
| 9/29/21 12:02 AM | MCKENNEY | The one I'm usually on |

23.     On October 4, 2021, MV1 and MCKENNEY exchanged Snapchat messages about meeting.  It does not appear that MVI and MCKENNEY met that day, but during these messages, MCKENNEY continues to pose as a student:

| Date and Time (EDT) | SENDER | Message |
|---|---|---|
| 10/4/21 6:58 AM | MCKENNEY | Wait where you wanna meet |
| 10/4/21 6:58 AM | MV1 | uhhh hold on idk |
| 10/4/21 7:00 AM | MV1 | i'll just text you when im there lol |
| 10/4/21 7:01 AM | MCKENNEY | Haha okkk babe |
| 10/4/21 7:01 AM | MV1 | why don't you have school??? |
| 10/4/21 7:02 AM | MCKENNEY | I soo I'm just about to skip |
| 10/4/21 7:02 AM | MV1 | whyyyyy |

| | | |
|---|---|---|
| 10/4/21 7:02 AM | MCKENNEY | Idk I wanna see u I kinda miss ya |
| 10/4/21 7:02 AM | MCKENNEY | Lol |
| 10/4/21 7:03 AM | MV1 | awe, sorry for falling asleep the other dayyy |
| 10/4/21 7:26 AM | MCKENNEY | Nahhh it's straight lol I've fell asleep on ya b4 |
| 10/4/21 8:16 AM | MV1 | It's raining |
| 10/4/21 8:36 AM | MCKENNEY | Ik |
| 10/4/21 8:57 AM | MV1 | i forgot to shave |
| 10/4/21 9:09 AM | MCKENNEY | I mean if u not trying to chill it's straight |
| 10/4/21 9:11 AM | MV1 | no i want to i just forgot to shave |

24.     As noted above, the MV1 reported that she was sexually assaulted on October 5, 2021.  On that day, MV1 and MCKENNEY exchanged the following Snapchat messages:

| Date and Time (EDT) | SENDER | Message |
|---|---|---|
| 10/5/21 4:23 PM | MCKENNEY | Hiiii |
| 10/5/21 4:23 PM | MV1 | hiiii |
| 10/5/21 4:31 PM | MCKENNEY | Whatcha up too |
| 10/5/21 4:32 PM | MV1 | finishing hw wbu |
| 10/5/21 4:32 PM | MCKENNEY | Not shiii im bout to get in the shower |
| 10/5/21 4:33 PM | MCKENNEY | Wyd tonig |
| 10/5/21 4:33 PM | MV1 | nothingggg |
| 10/5/21 4:33 PM | MV1 | wbu |
| 10/5/21 4:35 PM | MCKENNEY | Ha so we bout to link |

| | | |
|---|---|---|
| 10/5/21 4:35 PM | MV1 | sure |
| 10/5/21 4:35 PM | MV1 | 11 ish?? |
| 10/5/21 4:37 PM | MCKENNEY | Gotcha bby |
| 10/5/21 4:37 PM | MCKENNEY | Let's see those snaps that was on the storyyy lol |
| 10/5/21 4:39 PM | MV1 | the rest of them r bad that's why i didn't post themmm |
| 10/5/21 4:40 PM | MCKENNEY | Ahh u saved em for meee ðŸ¤ª |
| 10/5/21 4:40 PM | MCKENNEY | ðŸ˜‹ |
| 10/5/21 4:41 PM | MV1 | They're ugly smhhh |
| 10/5/21 4:41 PM | MCKENNEY | Stop playing |
| 10/5/21 4:41 PM | MCKENNEY | Lemme see ðŸ¥µ |
| 10/5/21 4:43 PM | MCKENNEY | Ugh just thinking about that sexy body |
| 10/5/21 4:44 PM | MCKENNEY | Get my shitt hard af |
| 10/5/21 4:49 PM | MV1 | howww |
| 10/5/21 4:53 PM | MCKENNEY | |
| 10/5/21 4:54 PM | MCKENNEY | Howwwâ€¦ugh that pretty ðŸ˜» I can't wait to give it a lil kissss |
| 10/5/21 4:55 PM | MCKENNEY | Lemme see the lil photo shoot so I could cummm |
| 10/5/21 4:56 PM | MCKENNEY | Lol |
| 10/5/21 5:01 PM | MV1 | i don't have it it's only like 2 pics |
| 10/5/21 5:02 PM | MCKENNEY | Let's see em lol |
| 10/5/21 5:02 PM | MV1 | here |
| 10/5/21 5:02 PM | MCKENNEY | U got more than jus those too babe ðŸ¥µðŸ˜‹ |
| 10/5/21 5:03 PM | MCKENNEY | Omg |
| 10/5/21 5:03 PM | MCKENNEY | Letssss see that assss |

| 10/5/21 5:03 PM | MV1 | noooo |
|---|---|---|
| 10/5/21 5:03 PM | MCKENNEY | Lmao |
| 10/5/21 5:03 PM | MCKENNEY | Babe |
| 10/5/21 5:03 PM | MV1 | You've already seen it |
| 10/5/21 5:04 PM | MCKENNEY | Ik I wanna see it all the time tho babyyy |
| 10/5/21 5:04 PM | MCKENNEY | I'm horny af |
| 10/5/21 5:04 PM | MV1 | That's not my faultttttt |
| 10/5/21 5:04 PM | MV1 | you can see it laterrrr |
| 10/5/21 5:04 PM | MCKENNEY | Lol |
| 10/5/21 5:05 PM | MCKENNEY | One more lol bra and pantie only |
| 10/5/21 5:05 PM | MCKENNEY | ðŸ¥µðŸ¥µðŸ˜ ðŸ˜ |
| 10/5/21 5:05 PM | MV1 | whyyy |
| 10/5/21 5:06 PM | MCKENNEY | Lol idk that'd be sooo sextet |
| 10/5/21 5:06 PM | MCKENNEY | Sexxxy |
| 10/5/21 5:06 PM | MV1 | smh |
| 10/5/21 5:06 PM | MV1 | hold onnn |
| 10/5/21 5:06 PM | MCKENNEY | ðŸ˜ðŸ˜ðŸ˜ðŸ˜ðŸ˜ |
| 10/5/21 5:10 PM | MCKENNEY | Ughhhh babe U sooo sexy |
| 10/5/21 5:10 PM | MV1 | nott rllyyyy |
| 10/5/21 5:29 PM | MCKENNEY | Yesss u r |
| 10/5/21 5:30 PM | MV1 | nooo |
| 10/5/21 5:31 PM | MCKENNEY | Forsure ðŸ˜ðŸ˜ðŸ˜ðŸ˜ |
| 10/5/21 5:31 PM | MV1 | smh smh is it going to be cold?? |

21

| 10/5/21 5:33 PM | MCKENNEY | Idk lemme see lol |
|---|---|---|
| 10/5/21 5:35 PM | MV1 | okkk |
| 10/5/21 7:05 PM | MV1 | wyd |
| 10/5/21 8:48 PM | MCKENNEY | I'm chilling uuu |
| 10/5/21 8:50 PM | MV1 | just got out of the shower |
| 10/5/21 9:13 PM | MCKENNEY | What time we chilling |
| 10/5/21 9:15 PM | MV1 | uhhh 11?? |
| 10/5/21 9:31 PM | MCKENNEY | Alright |
| 10/5/21 9:31 PM | MCKENNEY | I'm bout to eat and shiii |
| 10/5/21 9:32 PM | MV1 | okayyyy |
| 10/5/21 10:11 PM | MCKENNEY | Don't fall asleep lol |
| 10/5/21 10:12 PM | MV1 | i wonttttt |
| 10/5/21 10:30 PM | MCKENNEY | Prolly like 1115 1130 |
| 10/5/21 10:31 PM | MV1 | okayy |
| 10/5/21 10:31 PM | MV1 | why |
| 10/5/21 11:08 PM | MCKENNEY | I'm in traffic |
| 10/5/21 11:08 PM | MV1 | ew where |
| 10/5/21 11:09 PM | MCKENNEY | Right b4 Hartford |
| 10/5/21 11:09 PM | MV1 | whyyy |
| 10/5/21 11:10 PM | MCKENNEY | Construction |
| 10/5/21 11:11 PM | MV1 | smh |
| 10/5/21 11:11 PM | MV1 | i'm bored |
| 10/5/21 11:16 PM | MCKENNEY | I'm on Rt9 2 |

| 10/5/21 11:16 PM | MV1 | so how many more minutes i haven't left |
|---|---|---|
| 10/5/21 11:18 PM | MCKENNEY | When can you leave lol |
| 10/5/21 11:19 PM | MV1 | like in a bit |
| 10/5/21 11:20 PM | MCKENNEY | Kk I'll go clean my car rq |
| 10/5/21 11:21 PM | MV1 | r u there or no?? |
| 10/5/21 11:27 PM | MV1 | leaving now |
| 10/5/21 11:28 PM | MCKENNEY | I'm by the cumbys cleanin my car rq till u ready babe |
| 10/5/21 11:28 PM | MV1 | kk |
| 10/5/21 11:28 PM | MCKENNEY | Whenever your ready I'll be over there |
| 10/5/21 11:29 PM | MV1 | okayy |
| 10/5/21 11:36 PM | MV1 | here |
| 10/5/21 11:39 PM | MCKENNEY | I,m On my way! |
| 10/5/21 11:39 PM | MV1 | kk |
| 10/5/21 11:43 PM | MV1 | r u here?? |
| 10/5/21 11:44 PM | MCKENNEY | Yea |

25.     The following are excerpts of pertinent Snapchat conversations exchanged between MV1 and MCKENNEY the next day, October 6, 2021:

| 10/6/21 12:17 AM | MV1 | Lol my mom took my phone |
|---|---|---|
| 10/6/21 12:42 AM | MCKENNEY | Sry |
| 10/6/21 12:42 AM | MV1 | It's okay |
| 10/6/21 12:43 AM | MCKENNEY | U got in trouble |

| | | |
|---|---|---|
| 10/6/21 12:43 AM | MV1 | She read through my messages and I literally just had to tell her everything but like she doesn't know who u r or that we did anything lol |
| 10/6/21 12:44 AM | MCKENNEY | What ya tell her lol |
| 10/6/21 12:44 AM | MV1 | She said she will give it back once I give her the password but like I don't believe her |
| 10/6/21 12:44 AM | MV1 | Idek I was so pissed off |
| 10/6/21 12:45 AM | MCKENNEY | I'm sry babe why'd u jump out |
| 10/6/21 12:45 AM | MV1 | BECAUSE SHE GOT MMY FUCKING LOCATION FROM MY BROTHER |
| 10/6/21 12:46 AM | MV1 | and she was like driving there |
| 10/6/21 12:48 AM | MCKENNEY | Shiiii |
| 10/6/21 12:48 AM | MCKENNEY | That was fuked of them to snitch |
| 10/6/21 12:16 PM | MCKENNEY | What's up u good |
| 10/6/21 12:54 PM | MV1 | she wants to go through my phone i got it for the day but she wants to go through it |
| 10/6/21 12:54 PM | MV1 | I'm going to just log out of snap and then I'll give her my phone |
| 10/6/21 12:54 PM | MV1 | so idk what to do |
| 10/6/21 12:54 PM | MV1 | i deleted all of my nudes |

**School Surveillance Video**

26.     In or around November 15, 2021, GPD reviewed Naubec school's video surveillance system information.  GPD reported the school video surveillance showed an individual believed to be MV1 being picked up in a motor vehicle on October 5, 2021 at approximately 11:44 PM.  The vehicle appears to be a silver/gray colored 4 door sedan.  The vehicle license plate was not visible in the surveillance video.  GPD recorded a copy of this video and your affiant has reviewed it.  The below screenshot is from the video surveillance on October 5:

24



27.     GPD reported that they also observed school surveillance video showing what appeared to be the same vehicle, and an individual believed to be MV1, meeting at Naubuc elementary school on both September 23 and September 28 during the nighttime hours.  Upon information and belief, GPD did not immediately request a copy of those videos and they were automatically overwritten before it was preserved.

### Initial Identification of MCKENNEY

28.     On October 2, 2021, MV1 sent the following image to a friend and through multiple messages, said "… the guy I showed u is Georgie" who she had been meeting:



29.     On January 23, 2022, GPD received responses from Verizon for their ex parte legal processes.  That ex parte legal process was in an attempt to identify six of the IP addresses which appeared to be utilized by MCKENNEY's  Snapchat account.  GPD analyzed the response from Verizon and found that each of the six wireless IP addresses coincided with multiple phone numbers.  However, only one phone number repeatedly associated with more than one IP address.  That phone number was 719-666-1534.

30.     On or about February 2, 2022, GPD conducted an online database search which linked phone number 719-666-1534 to MCKENNEY.  GPD Officer Jason Trudeau advised that his former girlfriend is related to MCKENNEY and GPD Officer Trudeau personally met MCKENNEY on several occasions and knew MCKENNEY to reside in Windsor Locks.  GPD Officer Trudeau viewed a DMV photo of as well as the photo in paragraph 28 above and identified them as depicting the individual he knows as MCKENNEY.

31.     On February 9, 2022, SA Womersley searched 719-666-1534 in the ACCURINT database, which again linked to MCKENNEY.

32.     DMV records indicate that MCKENNEY resides at the TARGET PREMISES in Windsor Locks and is the registered owner of the TARGET VEHICLE, a 2020 Toyota Camry SE, bearing Connecticut license plate number BB23771.

33.     On February 13, 2022, GPD conducted surveillance at the TARGET PREMISES and photographed the TARGET VEHICLE.  The vehicle appears to have black rims, dark tint and an indent on the driver and rear passenger doors.  The image of that photograph is below, immediately followed by an image previously shown of the surveillance photo from Naubuc School:





**Federal Search Warrant for Snapchat Records**

34.     On February 28, 2022 ,your affiant swore to and executed federal search warrants for Snapchat records associated with MCKENNEY's Snapchat account (keepingupg) and MV1's snapchat account.  On March 9, 2022, HSI received records from Snapchat.  The search warrant return included much of the information noted above relating to MCKENNEY's contact with MV1, but it also included MCKENNEY's communications with numerous other minor females

27

(as well as other females who appear to be minors).  As detailed below, MCKENNEY used his "keepingupg" Snapchat account to exchange messages/videos/photos with MV1 and other minors including (a) sending pictures of his genitalia; (b) receiving images/videos depicting sexually explicit conduct from minor females; and (c) attempting to meet minors for illegal sexual activity.  Below are summaries of some of the Snapchat messages with identified minors as well as some Snapchat users who appear to be minors but are not yet identified:

### MINOR VICTIM 2 - Virginia

38.     MV2 is currently 14 years old and is in the 8th grade.  MV2 resides in Virginia. MV2's identity was confirmed by a school resource officer.

39.     According to the Snapchat records, between on or about October 19, 2021 and February 18, 2022, MCKENNEY used his "keepingupg" Snapchat account to exchange images and videos with MV2 on Snapchat.   The images and videos include (a) MCKENNEY sending MV2 pictures of himself with his penis exposed and (b) MV2 sending MCKENNEY videos/pictures of herself in various stages of undress, including lascivious images of her genitalia.

40.     The Snapchat records relating to communication between MV2 and keepingupg primarily contained images/videos (but did not include many chats).  However, the Snapchat records included a brief exchange that took place on or about February 11, 2022 in which MCKENNEY asked, "how I pay lol" and MV2 responded, "Cashapp".  MV2 also sent a snap of a pricing breakdown of her images which read, "boob pics- $2, pussy pics-$5, pussy vids- $10, ass pics- $7, shaking ass- $10, stripping vids-$15".

**MINOR VICTIM 3 - Massachusetts**

41.     MV3 is 17 years old and attends high school in Massachusetts.   Your affiant determined MV3's identity based on social media and other publicly available information but has not yet confirmed MV4's identity with law enforcement in Massachusetts.

42.     According to the Snapchat records, in or around November 2021, MCKENNEY used the "keepingupg" account to exchange images and videos with MV3 on Snapchat. According to the Snapchat return, there were 48 messages exchanged between keepingupg and MV3, including 81 pictures and 23 videos (some were duplicates).  Some of these images/videos depict a lascivious display of MV3's genitalia images as well as MV3 engaging in masturbation.

43.     The Snapchat records relating to communication between MV3 and "keepingupg" primarily contained images/videos (but did not include many chats).  However the Snapchat return included two messages sent from MV3 to keepingupg on November 7, 2021, "I want it in my mouth", and on November 8, 2021, "soon hopefully".

**MINOR VICTIM 4 – Massachusetts**

44.     MV4 is believed to be a 17 year old female who attends high school in Massachusetts.  Your affiant determined MV4's identity based on social media and other publicly available information but  has not yet confirmed MV4's identity with law enforcement in Massachusetts.

45.     According to the Snapchat records, in or around October 11, 2021 through January 11, 2022, MCKENNEY used the "keepingupg" account to exchange messages with MV4 on Snapchat.

46.     Below is a sample of some of the messages exchanged between MV4 and keepingupg.

| Date | SENDER | Message |
|------|--------|---------|
| 10/12/21 | MCKENNEY | Lol send me a snap<br>Nah where in mass u from |
| 10/12/21 | MV4 | Near broken<br>Brockton |
| 10/12/21 | MCKENNEY | Ha what's ur body look like 🙄 |
| 10/12/21 | MCKENNEY | Ha we bout to chill |
| 10/12/21 | MV4 | Where and when? |
| 10/12/21 | MCKENNEY | Lol what we about to do |
| 10/12/21 | MV4 | Hang out |
| 10/12/21 | MCKENNEY | Why you gotta ask him |
| 10/12/21 | MCKENNEY | He don't gotta know |
| 10/12/21 | MCKENNEY | Haha we not chilling with him when we chill lol |
| 10/12/21 | MV4 | No he don't live here |
| 10/12/21 | MCKENNEY | Soo he'll be straight I'm in Boston |
| 10/12/21 | MV4 | What? |
| 10/12/21 | MCKENNEY | Lol wyd tonight |
| 10/12/21 | MV4 | Idk |
| 10/12/21 | MCKENNEY | Soo let's chill |
| 10/12/21 | MV4 | Idk if I can |
| 10/12/21 | MCKENNEY | Why |
| 10/12/21 | MV4 | Because I my parents |
| 10/12/21 | MCKENNEY | Ahh |
| 10/12/21 | MCKENNEY | They strict |
| 10/12/21 | MV4 | Yeah |
| 10/12/21 | MCKENNEY | Ahh gotcha |
| 10/12/21 | MV4 | Yeah sorry I can't hang out tonight |
| 10/12/21 | MV4 | You said you are from Boston what part? |
| 10/12/21 | MCKENNEY | We'll Newton |
| 10/12/21 | MV4 | Oh |

| Date | SENDER | Message |
| --- | --- | --- |
| 10/15/21 | MCKENNEY | Wyd |
| 10/15/21 | MV4 | I am at homecoming |
| 10/15/21 | MCKENNEY | Let's fuk after |
| 10/15/21 | MV4 | Maybe |
| 10/15/21 | MCKENNEY | Kk |
| 10/15/21 | MV4 | I am going to tired |
| 10/15/21 | MCKENNEY | Nah we bout to have fun |

| Date | SENDER | Message |
| --- | --- | --- |
| 12/18/2021 | MCKENNEY | Haha lemme see |
| 12/18/2021 | MCKENNEY | That azzz [ass] |
| 12/18/2021 | MV4 | I would rather show it in person |
| 12/18/2021 | MCKENNEY | I kinda wanna seee b4 |
| 12/18/2021 | MV4 | Nope got to see it in person |
| 12/18/2021 | MV4 | So I'm guessing you don't want to |

## OTHER FEMALES WHO APPEAR TO BE MINORS

47.     **Minor Victim 5 (MV5)** identifies herself on Snapchat as a 13 year old from Ohio.  In or around February 2022, MV5 sent MCKENNEY a nude photo of herself on Snapchat.  MCKENNEY sent MV5 a video of himself masturbating.

48.     **Minor Victim 6 (MV6)** appears to be a preteen possibly younger aged blonde female. In or around January 2022, MV6 and MCKENNEY exchanged 16 images and 5 videos on Snapchat.  MV6 sent videos that appeared to depict herself masturbating and the lascivious display of her genitalia.  On or about January 10, 2022, MCKENNEY sent a message to MV6, "U sexy af".

31

49.    **Minor Victim 7 (MV7)** appears to be a high school student from South Carolin**a.**
On January 14, 2022, MCKENNEY sent an image of himself in a bathroom fully nude with his penis visible.  This bathroom appeared similar to the bathroom utilized in numerous other images/videos MCKENNEY sent via Snapchat.  MCKENNEY told MV7 that he was "16 about to be 17 next year" when she asked how old he was.  On September 3, 2021, MV7 messages MCKENNEY, "Put your tounge in mee".  MCKENNEY replies "Lemme see where".  MV7 says "That's [a] Surprise".  MCKENNEY responds, "Send me sumthin."

50.    The Snapchat return included messages exchanged with MV7.  Initially, MV7 texts MCKENNEY, "I still don't remember but ur cute".  MCKENNEY replies, "from Swipr".  Based on my training and experience, Swipr is a mobile application that can be downloaded on an iOS or Android device that markets itself as the "best app to find new friends on Snapchat".

### DNA and TATTOOs

51.    On or about February 2, 2022, GPD received a Forensic Biology Report for items of clothing from MINOR VICTIM 1 which were submitted to the Connecticut Department of Public Safety Forensic Science Laboratory by GPD.  GPD detailed that the Connecticut State lab report indicated there was more than one DNA profile obtained from MV1's clothing.  The DNA profiles were a mixture of DNA and obtained from the lower hem of the oversized tee dress, the exterior hips and waistband of sweatpants and the interior crotch of sweatpants.  The laboratory requested a buccal swab from any suspect for comparison purposes.

52.    Your affiant reviewed numerous images that the "keepingupg" Snapchat account sent to the Minor Victims in this affidavit as well as other Snapchat users   These included what appeared to be selfie and nude and partially nude images of MCKENNEY.  On some of these images there appears to be cursive lettering tattoo(s) visible on MCKENNEY's clavicle/upper

chest area.  MCKENNEY also appears to have a tattoo on his forearm.  These tattoos and others

can be seen in the below images.  The image in which MCKENNEY is wearing gray shorts/pants

was from 2-11-22 and he sent it to approximately twenty-one (21) females to include MV6.





53.     As discussed herein and in attachment B-2, your affiant respectfully requests a search warrant to (a) photograph and document MCKENNEY's tattoos and (b) to DNA swab MCKENNEY for comparison with any and all evidentiary items that may have MCKENNEY's DNA contained on them to include but not limited to MINOR VICTIM 1's clothing referenced within this affidavit.


**ITEMS FROM THE TARGET PREMISES**

54.     The photographs above, as well as others distributed from the "keepingupg" Snapchat account include images of MCKENNEY in what appears to be the same bathroom. Based on training and experience, this appears to be a residential style bathroom with personal effects in it.  There appear to be specific items within the bathroom as well, including furniture and a distinctive shower curtain.

55.     In some of the images, MCKENNEY sent of himself from the "keepingupg" Snapchat Account, MCKENNEY appears to be wearing a gold necklace with a gold ring

pendant.

56.    Furthermore, some of the images sent from the MCKENNEY Snapchat account to multiple other Snapchat account holders (including minor females) depict a male penis believed to be MCKENNEY's.  Contained within these photographs, there appear to be distinctive bedding.  Below is a non-explicit images of the bedding:



57.    Through an open-source check, your affiant located what appears to be MCKENNEY's Facebook account, URL: https://www.facebook.com/justin.mckenney.1, "Justin Mckenney".  Additionally, HSI SA Womersley located through an open-source check what appears to be MCKENNEY's Instagram account, https://www.instagram.com/keepingupw1thj/ (keepingupw1thj).  The images of MCKENNEY on these accounts appear to be similar to the

image of the male MINOR VICTIM 1 sent to her friend (see Paragraph 28 above).  Below are images form MCKENNEY's Facebook and Instagram Account that appear to be similar to the images sent by the "Snapchat" username "keepingupg" account:



58.     After reviewing open-source databases and public social media accounts, it appears that MCKENNEY works for S&F Construction out of Hudson, MA.  MCKENNEY appears to be a concrete worker and part of a local labor union.  MCKENNEY often posts stories of himself at his jobsite in Boston, MA.  Based on MCKENNEY's online activity, it appears that he leaves for work very early.   The drive from the TARGET PREMISES to the approximate area of Boston/Cambridge, MA where MCKENNEY's job site is located, is approximately 1 hour and 40 minutes.   On 2/14/22 at approximately 6:55AM, MCKENNEY posted a story that was a video wearing a construction hard hat at the job site.  Law enforcement intends to serve the arrest warrant shortly after MCKENNEY leaves his home for work.  It is possible that this may require the arrest warrant to be executed between 5:00 and 6:00 a.m.  If that eventuality happens, your affiant requests permission to start the search warrant on the SEARCH LOCATIONS at or around the same time to ensure law enforcement safety and prevent the destruction of evidence.

**Common Characteristics of Individuals who Receive Child Pornography and Use a False Persona to Engage in Sexually Explicit Communications with Minors**

59.     Based upon my training and experience, as well as from information provided to me by other law enforcement personnel involved in the investigation of cases involving the sexual exploitation of children, I believe that adults who contact minors over apps such as Snapchat and engage in sexualized chats with minors are doing so to "groom" the minors and make them comfortable with the sexualized nature of the communications.  In the "grooming" phase, an adult who has a sexual interest in children will ask for pictures of the child and then respond with flattery to encourage the child to send more pictures of themselves. In my experience, an adult who portrays themselves as a child of similar age, engages in sexualized chats with a child and transfers obscene material to that child is attempting to normalize the behavior in order to obtain similar material from the child and/or to convince the child to meet in person.

60.     Based upon my training and experience, as well as from information provided to me by other law enforcement personnel involved in the investigation of cases involving the sexual exploitation of children, I believe the following traits and characteristics are generally found to exist and be true in cases involving adults who distribute obscene material to minors and/ or attempt to receive sexually explicit images from minors while posing as a minor; and/or coerce or entice a minor to meet or attempt to meet a minor for illegal sexual activity:

61.     The majority of offenders often engage with multiple minors through their false online persona(s) in an attempt to receive sexually explicit material from the minors or to entice a minor to engage in illegal sexual activity.  These offenders use multiple techniques to encourage

a minor to create and/or share sexually explicit images including (a) flattery and "grooming"; (b) distributing obscene material to those minors; and/or (c) engaging in sexually explicit chats. The different Internet based vehicles used by such individuals to communicate with minors include, but are not limited to: mobile applications, instant messaging, social media (both web-based and application) and other similar vehicles.

    a. The majority of these offenders rarely, if ever, dispose of the child pornography or sexually explicit images that they collect and may go to great lengths to conceal and protect from discovery, theft, and damage their collections of illicit materials.

    b. The majority of offenders often engage in their distribution of obscene material and receipt of child pornography over multiple devices. Based on my training and experience, offenders often communicated with minors both on cellphones and computers which provide a larger screen, a full-size keyboard to facilitate typing and emancipate the offender's hands from holding a device.

    c. The majority of these offenders often use online resources to store child pornography, including online storage services offered by Apple, Microsoft, Inc., Yahoo! Inc., and Google, Inc., among others. The online storage services allow a user to set up an account with a remote computing service that provides electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer or cell phone with access to the Internet.

## The TARGET CELL PHONE

62. In addition, as described above and in Attachment B-4, your affiant respectfully requests a search warrant to seize and forensically search the TARGET CELL PHONE (which is assigned 719-666-1534). As noted above, "Snapchat" is a social media mobile app that is

primarily utilized on a cellphone or tablet.  MCKENNEY utilized the TARGET CELL PHONE

(719-666-1534) to access the "keepingup" "Snapchat" account. Based on my training and

experience, I know that Snaps/stories/chats/images/videos can be saved within the Snapchat

application and on the cellphone (electronic media device).  Through your affiant's training and

experience individuals that utilize "Snapchat" to request and send images will have these

images/videos saved whether by screenshot, camera roll, or saved within the application on their

device.  Through your affiant's training and experience, deleted images/videos/messages etc. are

still recoverable through a forensic search.

      63.    Based on my training and experience, I use the following technical terms to

convey the following meanings:

     a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular
        telephone) is a handheld wireless device used for voice and data communication
        through radio signals.  These telephones send signals through networks of
        transmitter/receivers, enabling communication with other wireless telephones or
        traditional "land line" telephones.  A wireless telephone usually contains a "call
        log," which records the telephone number, date, and time of calls made to and
        from the phone.  In addition to enabling voice communications, wireless
        telephones offer a broad range of capabilities.  These capabilities include: storing
        names and phone numbers in electronic "address books;" sending, receiving, and
        storing text messages and e-mail; taking, sending, receiving, and storing still
        photographs and moving video; storing and playing back audio files; storing
        dates, appointments, and other information on personal calendars; and accessing
        and downloading information from the Internet.  Wireless telephones may also
        include global positioning system ("GPS") technology for determining the
        location of the device.

     b.   Digital camera:  A digital camera is a camera that records pictures as digital
        picture files, rather than by using photographic film.  Digital cameras use a
        variety of fixed and removable storage media to store their recorded images.
        Images can usually be retrieved by connecting the camera to a computer or by
        connecting the removable storage medium to a separate reader.  Removable
        storage media include various types of flash memory cards or miniature hard
        drives.  Most digital cameras also include a screen for viewing the stored images.
        This storage media can contain any digital data, including data unrelated to
        photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of

40

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

64.     Based on my training, experience, and research, I believe that the TARGET CELL PHONE has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

65.     In addition, as described above and in Attachment B-1, this application seeks permission to search for evidence, fruits, instrumentalities and contraband that might be found on the TARGET PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

66.     *Probable cause.* I submit that if a computer or storage medium is found on the TARGET PREMISES, there is probable cause to believe the records described in Attachment B will be stored on that computer or storage medium, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have

41

been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

  b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

  c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. While it is technically possible to delete this information, computer users typically do not erase or delete it, because special software is typically required for that task.

  d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

  67. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the TARGET PREMISES because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium, but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates

files were created and the sequence in which they were created, although this information can later be falsified.

b.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log (1) computer user account session times and durations; (2) computer activity associated with user accounts; (3) electronic storage media that connected with the computer; and (4) the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer, or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.      A person who has appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an

accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.     I know that when an individual uses a computer, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of a crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain (1) data that is evidence of how the computer was used; (2) data that was sent or received; (3) notes as to how the criminal conduct was achieved; (4) records of Internet discussions about the crime; and (5) other records that indicate the nature of the offense.

68.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

69.     *The time required for an examination*. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a

computer has been used, what it has been used for, and who has used it requires considerable

time, and taking that much time on premises could be unreasonable. As explained above,

because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be

necessary to thoroughly examine storage media to obtain evidence. Storage media can store a

large volume of information. Reviewing that information for things described in the warrant can

take days or weeks, depending on the volume of data stored, and would be impractical and

invasive to attempt on-site.

70.     *Technical requirements*. Computers can be configured in several different ways,

featuring a variety of different operating systems, application software, and configurations.

Therefore, searching them sometimes requires tools or knowledge that might not be present on

the search site. The vast array of computer hardware and software available makes it difficult to

know before a search what tools or knowledge will be required to analyze the system and its data

on the target premises. However, taking the storage media off-site and reviewing it in a

controlled environment will allow its examination with the proper tools and knowledge.

71.     *Variety of forms of electronic media*. Records sought under this warrant could be

stored in a variety of storage media formats that may require off-site reviewing with specialized

forensic tools.

72.     *Nature of examination.* Based on the foregoing, and consistent with Rule

41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying

storage media that reasonably appear to contain some or all of the evidence described in the

warrant, and would authorize a later review of the media or information consistent with the

warrant. The later review may require techniques, including but not limited to computer-assisted

cans of the entire medium, that might expose many parts of a hard drive to human inspection in

order to determine whether it is evidence described by the warrant.

73.     The TARGET PREMISES appears to be occupied by MCKENNEY, his mother and his uncle.  Because multiple people may share the TARGET PREMISES as a residence, it is possible that the TARGET PREMISES will contain storage media that are predominantly used, and perhaps owned, by a person who is not suspected of a crime. If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

74.     Based on the aforementioned information in this Affidavit, I believe there is probable cause to believe, and I do believe, that evidence, contraband, fruits, instrumentalities of the TARGET OFFENSES, as more fully described in attachment B-1, B-2, B-3 and B-4 , are located within the SEARCH LOCATIONS which are more fully described in Attachments A-1, A-2, A-3 and A-4.

75.     In addition, I request the Court to find that good cause exists for the execution of the search warrants as early as 5:00 a.m. through 10:00 p.m.

76.     In addition, based on the information set forth in this Affidavit, I believe there is probable cause to believe that MCKENNEY committed the TARGET OFFENSES.

BRIAN P WOMERSLEY
Digitally signed by BRIAN P WOMERSLEY
Date: 2022.03.16 11:29:55 -04'00'

Special Agent Brian Womersley
Department of Homeland Security
Homeland Security Investigations

Subscribed and sworn by telephone on this ____16th____ day of March, 2022

Date: 2022.03.16 12:12:18 -04'00'

HON. THOMAS O. FARRISH
UNITED STATES MAGISTRATE JUDGE